UNITED STATES DISTRICT COURT
NORTHISN DISTRICT OF INDIANA
SOUTH BEND DIVISION

RAYMOND L. HOCHSTETLER,           )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )    Case No.:  3:13-CV-662 JD
                                   )
CAROLYN W. COLVIN,                 )
Acting Commissioner of Social Security,[1]  )
                                   )
        Defendant.                 )

## OPINION AND ORDER

On July 1, 2013, Plaintiff Raymond Hochstetler filed a complaint in this Court seeking

review of the final decision of the Defendant Commissioner of Social Security.  [DE 1.]  The

matter is fully briefed and ripe for decision.  For the reasons stated below, the Court **REMANDS**

this matter to the Commissioner for further proceedings.

## I.  Procedural History

Mr. Hochstetler filed an application for disability insurance benefits in March 2011 and

an application for supplemental security income in April 2011.  (Tr. 298–311.)  His applications

were denied in June 2011, and again on reconsideration in July 2011.  (Tr. 131–34.)  A hearing

was held before Administrative Law Judge Romona Scales in December 2011 (Tr. 90–130), after

which she issued a decision denying both claims (Tr. 138–51).  The Appeals Council granted a

request for review of that first decision and remanded the case back to the ALJ for further

consideration of certain evidence and its effect on Mr. Hochstetler's residual functional capacity.

(Tr. 157–61.)

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Though Mr. Hochstetler filed his suit after Ms. Colvin took office, his complaint named the previous Commissioner, Michael J. Astrue.  [DE 1.]  The subsequent briefing correctly identified Ms. Colvin as Acting Commissioner.  Pursuant to Federal Rule of Civil Procedure 25(d), Ms. Colvin is substituted for Mr. Astrue as the defendant in this action.

A hearing was held on November 15, 2012, again before ALJ Scales. (Tr. 42–89.) On December 28, 2012, the ALJ issued her decision, again denying both claims. (Tr. 14–34.) The Appeals Council denied a request to review the second decision on May 13, 2013. (Tr. 1–3.) This suit followed.

## II. Facts

Mr. Hochstetler was born on September 17, 1964, and was 48 years old on the date the ALJ rendered her decision. (Tr. 45.) He has an eighth grade education. (Tr. 47.) Mr. Hochstetler alleges a disability onset date of April 14, 2006 (Tr. 14), and claims disability based on both physical and mental impairments.

### A. Medical Evidence of Physical Impairments

Mr. Hochstetler claims several physical impairments contribute to his disability, including Chronic Obstructive Pulmonary Disorder ("COPD") and musculoskeletal issues with his knees, lower back, and hands.

Medical records of Mr. Hochstetler's physical impairments date to late 2006. On November 6, 2006, he presented to the Bowen Center for a psychiatric assessment. Relative to his physical condition, the notes from that assessment indicate that the ring finger on his right hand was causing him pain, which he described as potentially having been the result of a work injury. (Tr. 480.) Notes from a December 1, 2006, psychiatric evaluation state that Mr. Hochstetler had undergone surgery on his left hand. (Tr. 474.)

On December 7, 2010, Mr. Hochstetler was brought to Woodlawn Hospital for anxiety. During that examination, he reported osteoarthritis in his knees, which caused "chronic pain." (Tr. 511.) Additionally, a chest x-ray showed advanced COPD. (*Id.*)

On May 13, 2011, Mr. Hochstetler presented to Randall Coulter, D.O., at MedStat Urgent Care & Occupational Health for a consultative examination. (Tr. 548.) Dr. Coulter's review of systems listed "skeletal abnormalities (arthritis), joint pain (low back and knees), and joint stiffness (low back and knees)." (*Id.*) Mr. Hochstetler's gait was slightly unsteady and he used a cane to ambulate. (Tr. 549.) He could raise his legs both in a seated and supine position, but with some difficulty due to low back pain. (*Id.*)

A few days later, Mr. Hochstetler presented to M. Brill, M.D., for the opinion of the state agency medical consultant. (Tr. 554–61.) Dr. Brill noted symptoms of emphysematous pulmonary changes and knee pain. (Tr. 555.) Dr. Brill opined the Mr. Hochstetler did not "need" his cane for ambulation and that there was also no objective loss of strength or x-ray evidence of arthritis that would limit Mr. Hochstetler's ability to walk or stand. (Tr. 560.)

On August 17, 2011, Mr. Hochstetler presented to the Four County Counseling Center for a mental evaluation. Relevant to Mr. Hochstetler's physical condition, Despina Moise, M.D., noted that he had arthritis in his knees and walked with a cane. (Tr. 607.) Thirteen days later, Mr. Hochstetler reported his arthritis to case worker Mary Osburn of the Four County Counseling Center, who further noted that he walked with a cane. (Tr. 677.)

On February 11, 2012, Mr. Hochstetler presented to Woodlawn Hospital for coughing and chest tightness caused by smoke inhalation. (Tr. 831.) A radiology report stated that Mr. Hochstetler had "[m]ild hyperexpansion and flattening of the diaphragm suggestive of COPD." (Tr. 835.)

On August 23, 2012, Mr. Hochstetler was evaluated by William Terpstra, M.D., of Wagoner Medical Center. Mr. Hochstetler reported pain in his lower back, hands, and right knee. (Tr. 661.) Dr. Terpstra's report stated that Mr. Hochstetler's fine and gross motor

movements were normal; that he could walk on tiptoes and heels, as well as tandem walk and squat; and that his gait and station were normal. (Tr. 662.)

On October 9, 2012, Mr. Hochstetler presented to Lisa Ronback, M.D., of Rochester Orthopedics, complaining of pain in his thumb and that his fingers go numb and turn white after an accident on his moped five days earlier. (Tr. 839.) The report states that Mr. Hochstetler has arthritis and shortness of breath without chest pain. (*Id.*) A physical examination showed a scaphoid fracture of the right wrist and joint laxity in his left hand. (Tr. 840.) After a subsequent evaluation on October 23, 2012, Dr. Ronback determined that Mr. Hochstetler could continue to work at his current job with a splint. (Tr. 842.)

**B.     Medical Evidence of Mental Impairments**

On November 6, 2006, Mr. Hochstetler presented to the Bowen Center. Mr. Hochstetler reported hearing voices and alcohol dependence. (Tr. 479.) On December 1, 2006, he returned to the Bowen Center for a psychiatric evaluation by Snieguole Radzeviciene, M.D. (Tr. 473.) Dr. Radzeviciene concluded that Mr. Hochstetler suffered from "Social Anxiety Disorder" due to panic attacks, paranoia, depression, insomnia, and "auditory hallucinations once a week." (Tr. 473–77.) Dr. Radzeviciene also assessed that Mr. Hochstetler had limited judgment, poor insight, low intellect, and a grossly intact memory, but that he exhibited good concentration at the time of the evaluation. (Tr. 476.) Dr. Radzeviciene assessed a global assessment of functioning ("GAF") score of 50 at the time of admission.[2] (Tr. 477.)

---

[2] A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* Diagnostic & Statistical Manual of Mental Disorders-Text Revision 32 (4th ed. 2000). The higher the GAF score, the better the individual's level of functioning. While GAF scores have recently been replaced by the World Health Organization Disability Assessment Schedule, at the time relevant to Mr. Hochstetler's appeal, GAF scores were in use. *See* Wikipedia, Global Assessment of Functioning, http://en.wikipedia.org/wiki/ Global_Assessment_of_Functioning (last visited Sept. 3, 2014). A score of 50 indicates that Mr. Hochstetler was experiencing "serious symptoms." *Id.*

On January 16, 2007, Mr. Hochstetler presented to psychologist Patrick Utz, Ph.D., of Indiana Rehabilitation Services for an interview and the administration of intellectual testing. (Tr. 491.) Mr. Hochstetler reported panic attacks and depression. (Tr. 492.) The Wechsler Adult Intelligence Scale III showed that he measured in the "high Borderline range" with a score of 78. (Tr. 492.) The Wechsler Memory Scale III showed that Mr. Hochstetler had "no major memory problems." (Tr. 493.) Dr. Utz assessed a GAF score of 50. (Tr. 493.)

On January 31, 2007, Mr. Hochstetler presented to a social worker[3] at the Bowen Center for a report on his psychiatric status. The report, which was countersigned by Dr. Radzeviciene, assessed that Mr. Hochstetler suffered from a social phobia due to panic attacks. (Tr. 503.) Mr. Hochstetler seemed cooperative and coherent, but his thought process was somewhat loose with fragmented run-on sentences. (Tr. 501.) The report stated that Mr. Hochstetler would "struggle with remembering simple tasks or instructions" and that the he would not be "reliable at any work situation" because of his inability to leave his house. (Tr. 503–04.) The report further stated "even if he got to work, he would lose focus . . . and not be able to finish a specific task." (Tr. 504.) The report estimated the probable duration of impairment to be "lifetime and continuous." (Tr. 505.) The report stated a GAF score of 55 to 60. (Tr. 500.)

On December 7, 2010, Mr. Hochstetler was brought to Woodlawn Hospital by EMS for anxiety. (Tr. 511.) Kevin O'Brien, M.D., found evidence of paranoia, alcohol intoxication, and the presence of THC; Dr. O'Brien subsequently referred Mr. Hochstetler to the Four County Counseling Center. (Tr. 512.)

On December 30, 2010, Mr. Hochstetler presented to the Four County Counseling Center. (Tr. 522.) He initially received an Intake/Biopsychosocial examination, which noted mood disturbance, audio hallucinations, depression, paranoia, and problems with substance

---

[3] The name of the social worker is not legible in the record.

abuse. (Tr. 525–28.) During the interview, he seemed agitated, hyper-vigilant, anxious, and irritable. (Tr. 526.) While he had fair eye contact and intact memory, he showed low intelligence with "loose, scattered thoughts" and "rapid speech." (Tr. 525–26.) Mr. Hochstetler stated that he takes care of his ill mother, but "it takes him a long time to do any chore including making meals for himself." (Tr. 525.) The report stated a GAF score of 40 and estimated his prognosis as "poor." (Tr. 525, 529.)

Mr. Hochstetler received continuing services from the Four County Counseling Center, including regular meetings with Dr. Moise.[4] On February 1, 2011, Dr. Moise conducted an initial psychiatric evaluation. Dr. Moise observed that Mr. Hochstetler was very guarded, suspicious, uncooperative, very irritable, and unable to focus. (Tr. 530–31.) He portrayed good eye contact, but it was in the form of an intense stare. (Tr. 531.) While he could recall remote events, he could not recall recent events, including the current month. (Tr. 531.) Dr. Moise also noted insomnia and that Mr. Hochstetler experienced auditory hallucinations, which told him to "kill others." (Tr. 530.) Dr. Moise assessed a GAF score of 40 and recommended medication and a reference for case management. (Tr. 534–35.)

Mr. Hochstetler continued to see Dr. Moise over the next several months and experienced ups and downs in his mental state during that time. In February through September 2011, Mr. Hochstetler showed some improvement in his mental state, appearing calmer and experiencing fewer or less intense hallucinations. (Tr. 540, 542, 563, 566, 597, 619, 631.) During early November 2011, Mr. Hochstetler was unable to obtain his medication due to financial difficulties. (Tr. 769.) On November 22, 2011, Dr. Moise noted that he was once again hearing voices and having trouble leaving his home due to anxiety. (Tr. 766.) On December 20, 2011,

---

[4] Mr. Hochstetler also frequently attended the Four County Counseling Center for case management and group therapy. (Tr. 617–643, 688–767.)

6

Dr. Moise noted that Mr. Hochstetler was hearing voices telling him to harm others, which he was able to ignore, and that he would avoid others "so as not to get too angry at anyone." (Tr. 754.)

In early January 2012, Mr. Hochstetler was able to afford some medication. (Tr. 749.) On January 17, 2012, Dr. Moise noted that the voices were better, but still bothering him on occasion. (Tr. 734.) He appeared to be coping with daily activities, but would isolate himself fearing that he would react negatively to others. (*Id.*) His mood was described as "up and down." (*Id.*) In July 2012, he reported sleeping well and that he experienced no mood or psychotic symptoms. (Tr. 703.) However, in August 2012 (while taking his medication), Mr. Hochstetler experienced a deterioration where he started experiencing auditory hallucinations ("the voices talk to me all the time now") and persecutory delusions (feeling that people were "after" him), both of which had worsened over the proceeding weeks. (Tr. 691.) Mr. Hochstetler's symptoms "started after he went to work[;] he stated that a co-worker kept threatening to hurt him, and he felt scared every day he went to work. He finally asked for a transfer, but unfortunately they do not have as many hours for him in the new department." (Tr. 691.) Dr. Moise prescribed a new medication. (Tr. 691.)

On August 17, 2011, Dr. Moise completed a Mental Impairment Questionnaire. (Tr. 603.) Dr. Moise listed clinical findings including: psychotic disorder, polysubstance dependence, alcohol abuse, auditory hallucinations, paranoia, mood swings such as irritability and hostility, low intelligence, and poor memory. (Tr. 603–04.) Dr. Moise further stated that Mr. Hochstetler had difficulty thinking and concentrating with loosening associations that make him unable to perform work-like activities. (Tr. 604.) While medications helped reduce irritability and psychotic symptoms, Dr. Moise listed the prognosis as guarded. (Tr. 604.) Dr.

Moise stated that Mr. Hochstetler's impairments lasted or were expected to last over twelve months, and would likely cause him to be absent from work more than three times a month. (Tr. 604–05.) Dr. Moise further opined that "he would not be able to work around others productively" and due to "low intelligence level [and poor memory], he would not be able to learn and carry out instructions." (Tr. 606.)

On June 6, 2011, state agency consultant Stacia Hill, Ph.D., completed a Mental Residual Functional Capacity Assessment. (Tr. 592–94.) Dr. Hill opined that Mr. Hochstetler was: not significantly limited in his ability to remember locations and work-like procedures, or to understand and remember very short and simple instructions; moderately limited in remembering detailed instructions; not significantly limited in sustained concentration and persistence, except moderately limited in ability to carry out detailed instructions; not significantly limited in social interaction; and not significantly limited in adaptation, except moderately limited in ability to respond appropriately to changes in work setting. (Tr. 592–93.) Dr. Hill additionally opined that Mr. Hochstetler can understand, remember, and carry-out simple tasks; can relate at least superficially on an ongoing basis with co-workers and supervisors; can attend to task for sufficient periods of time to complete tasks; and can manage the stresses involved with simple work. (Tr. 594.) This assessment was affirmed by state agency consultant Donna Unversaw, Ph.D., on June 28, 2011. (Tr. 599.)

**C.      Hearing Testimony**

At the 2012 hearing, testimony was heard from Mr. Hochstetler, case manager Sarah Silance, and Vocational Expert ("VE") Leonard Fisher. (Tr. 42–43.)

1. *Mr. Hochstetler's Testimony*

Mr. Hochstetler is not married and lives alone. (Tr. 46.) He attended school through eighth grade, has problems reading and writing longer words, and can perform only simple addition and subtraction. (Tr. 47–48.)

At the time of the hearing, Mr. Hochstetler worked part-time at Modern Materials, doing production line work. (Tr. 48.) He has worked there since approximately June 2012, with hours varying anywhere from eight to twenty-four hours per week, though on two occasions he worked approximately thirty-nine hours. (Tr. 48–49.) He stated that he does not receive more hours partly because of scheduling and partly because he would not be able to work full-time, since he cannot handle that many hours on his feet. (Tr. 49.) He described having some focus issues on the job (Tr. 49, 65) and that he usually makes it through about four hours of work before his feet start to get bad (Tr. 60). He further testified that he is pushing himself harder while at work and would ideally stand for no longer than an hour and a half at one time. (Tr. 60.) He estimated that the heaviest thing he lifts at his current employment is seven to eight pounds, but that he is able to lift approximately twenty pounds approximately three times per day. (Tr. 50, 64–65.)

Mr. Hochstetler discussed his mental condition. (Tr. 55–59, 63–64.) He said he has to wake up approximately three hours before work due to his anxiety and paranoia of going outside. (Tr. 55–56.) He described this anxiety as causing him to feel like it was hard to breathe and like he is going to pass out, which he feels despite taking prescribed medication. (Tr. 56.) Mr. Hochstetler deals with his anxiety at work by going down on his knees and resting for two to three minutes, which he does anywhere from two to five times per day. (Tr. 57.) He also sometimes feels paranoid at the grocery store and so will avoid going to the store despite needing something. (Tr. 57.) Mr. Hochstetler stated that he hears voices that "want [him] to hurt people

and stuff." (Tr. 58.) He hears the voices despite taking medication, though some days are worse than others. (Tr. 58.) The voices seem to get worse when he is around people and so he avoids others, including co-workers, if possible. (Tr. 63.) Sometimes the voices are triggered by a single person, but a group of three to four people cause the voices to worsen. (Tr. 64.)

Mr. Hochstetler testified that he sometimes did not take his medication, either because he would forget or because he could not afford his medication. During the times that he could not afford his medication, he did buy cigarettes, which he used as a form of self-medication to calm himself. (Tr. 58–59.) He also relayed that the only side effect from his medication was "probably dizziness." (Tr. 64.)

Physically, Mr. Hochstetler's knuckles in his hands fall out of their joints when lifting an object, and he has to hold them back into place. (Tr. 59.) He believes this is caused by weak tendons in his knuckles. (Tr. 60.) Further, he has problems with his feet and knees swelling. (Tr. 59.) To reduce swelling in his feet, Mr. Hochstetler soaks his feet. (Tr. 60.) He believes that he could stand about an hour to an hour-and-a-half before needing to sit for five to ten minutes. (Tr. 60.) He can walk about 100 feet before needing to sit down and can sit in a chair for approximately one hour before feeling discomfort in his back. (Tr. 61.) Mr. Hochstetler uses a cane to relieve pressure off his right knee, though the cane has not been prescribed to him. (Tr. 62–63.) He further explained that, since a moped accident in October 2012, he has worn a brace on his right hand which has limited his ability to use his cane. (Tr. 62.)

With regard to his daily activities, Mr. Hochstetler described his difficulty cooking because of his hands and grocery shopping because of the large number of people. (Tr. 63.) He watches television, but sometimes has trouble focusing on the plot. (Tr. 64.) He is able to manage his own finances. (Tr. 54.)

*2.      Ms. Silance's Testimony*

Sarah Silance is an adult case manager at the Four County Counseling Center.  (Tr. 67.)
At the time of the hearing, she had been working with Mr. Hochstetler for close to a year-and-a-half.  (*Id.*)  She had been present for Mr. Hochstetler's hearing testimony and agreed with most of what he had said, except she thought he did not explain the full extent of the issues with his hands, specifically his arthritis.  (Tr. 67–68.)

Ms. Silance attends many of Mr. Hochstetler's medical appointments, to help him remember to report all of his issues to the doctors.  (Tr. 68.)  She has, at times, seen symptoms or behaviors that would make it difficult for him to work, but said that she believed Mr. Hochstetler was more comfortable with her because of his familiarity with her and the fact that their interactions were typically one-on-one.  (Tr. 68–69.)  She stated Mr. Hochstetler would get confused and anxious, as well as withdraw, when not taking his medication.  (Tr. 69.)  While on medication, he sometimes has similar problems, but she described those issues as "not nearly as bad."  (Tr. 69.)

Ms. Silance helps Mr. Hochstetler fill out forms (beyond basic demographic information) and helps with his mail, especially mail regarding benefits.  (Tr. 69–70.)  Ms. Silance believes Mr. Hochstetler is able to keep up his home "[f]or the most part" and is motivated to do so, but has physical difficulties with his hands and arthritis.  (Tr. 71.)  Ms. Silance testified that she believes Mr. Hochstetler could not work a full-time job, because of anxiety, paranoia, and physical problems with his hands and his knees.  (Tr. 72–73.)

*3.      Vocational Expert's Testimony*

The VE characterized Mr. Hochstetler's past work as: inspector, packer, spray painter, forklift operator, conveyor feeder/off-bearer, dishwasher, and assembler.  (Tr. 75–76.)  The work

ranged from high semi-skilled to unskilled and was performed at exertional levels from medium to light. (*Id.*)

The ALJ asked the VE a series of hypotheticals regarding an individual with Mr. Hochstetler's age, education, vocational background, and the following abilities/limitations: can perform no greater than light exertional work; is limited to occasional stooping, crouching, crawling, kneeling, balance and climbing; should avoid concentrated exposure to extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation; can understand, remember, and carry out simple, routine tasks; can maintain adequate attention and concentration for those tasks; could relate on at least a brief superficial and ongoing basis with co-workers and supervisors; and would be limited to occasional and brief, superficial contact with the general public, but could otherwise manage the changes associated with the routine work setting. (Tr. 76–77.) The VE stated that such an individual could not perform Mr. Hochstetler's previous work. (Tr. 77.) However, the VE testified that the hypothetical individual could perform certain unskilled and light level jobs. (Tr. 77.)

Next, the ALJ added an additional limitation to the hypothetical, namely that the person was limited to a total of four hours of standing and/or walking during the course of the workday; and frequent handling and fingering bilaterally. (Tr. 77.) The VE testified that such a person could perform some of the previously listed jobs, as well as an additional job identified by the VE. When given the additional limitations that the person requires work that is free of fast paced production or quota, and that the person would require a position that could be best performed independently of others or in small groups of two or three, the VE identified available jobs. (Tr. 78–79, 85–86.)

The VE testified that being off-task for fifteen to twenty percent of the workday would preclude a person from sustaining competitive employment. (Tr. 79.) The use of a cane for balance and ambulation would also preclude performing the light level jobs listed; however, the use of a cane for ambulation only would still allow work in certain positions. (Tr. 79–80.)

Mr. Hochstetler's counsel questioned the VE. (Tr. 80–85.) Counsel posed a hypothetical to the VE regarding an individual of Mr. Hochstetler's age, education, and vocational background with the following abilities/limitations: can ambulate and carry less than ten pounds occasionally; stand and walk for only two hours in an eight-hour day; would only occasionally be able to lift, bend, twist, kneel, squat and could not do prolonged standing or walking; with a light limitation and the required use of the cane when doing those two hours of standing or walking; and sitting two hours at a time. (Tr. 80–81.) The VE answered that there would be jobs available in certain types of unskilled, sedentary work. (Tr. 82–83.)

The VE testified that to do any kind of sedentary work requires both hands bilaterally or frequently. (Tr. 83.) Upon questioning by counsel, the VE stated that certain jobs would be eliminated if a person was restricted from fumes, odors, wetness, humidity, cold, and heat. (Tr. 84.) The VE also confirmed that a person would have trouble sustaining competitive employment in an unskilled job if a person misses more than one day of work per month. (Tr. 86.)

**D.     The ALJ's Decision**

On December 28, 2012, the ALJ rendered her decision, ultimately finding that Mr. Hochstetler is not disabled. (Tr. 14–34.) At step two, she found the following severe impairments: psychotic disorder, mood disorder, high borderline intellectual functioning, and history of alcohol dependence. (Tr. 17.) The ALJ also noted several other impairments,

including: a fractured right wrist, arthritis, a respiratory condition, right hand finger pain, osteoarthritis of the knees, lower back pain, and swelling of the feet. (Tr. 17–20.) The ALJ found each of these impairments to be non-severe. (*Id.*)

At step three, the ALJ determined that Mr. Hochstetler did not have an impairment or combination of impairments that met or medically equaled any listed impairments. (Tr. 20–23.) Although Mr. Hochstetler did not argue before the ALJ that a listing was met, the ALJ analyzed whether the severity of Mr. Hochstetler's mental impairments met the criteria of listings 12.02, 12.03, 12.04, and 12.09. (Tr. 21.) She found that neither the "paragraph B" [5] nor the "paragraph C" [6] criteria had been met. (Tr. 21–23.)

The ALJ then articulated the following residual functional capacity ("RFC") determination:

> [Mr. Hochstetler] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that [Mr. Hochstetler] can lift and/or carry up to twenty (20) pounds occasionally and up to ten (10) pounds frequently, can stand and/or walk for about six (6) hours and can sit for about six (6) hours during an eight-hour workday, except: [Mr. Hochstetler] can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds; [Mr. Hochstetler] must avoid concentrated exposure to extreme temperatures, wetness, humidity, and pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation; [Mr. Hochstetler] can understand, remember, and carry-out simple, routine tasks, and can maintain adequate attention and concentration for such tasks; [Mr.

---

[5] The paragraph B criteria for listings 12.02, 12.03, and 12.04 are that the disorder resulted in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[6] In order to meet paragraph C criteria for listings 12.02, 12.03, or 12.04, the claimant must have a "[m]edically documented history" of a mental disorder "of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Hochstetler] can relate on at least a brief, superficial, and on-going basis with co-workers and supervisors; [Mr. Hochstetler] is limited to brief, superficial interaction with the general public; and [Mr. Hochstetler] can manage changes in a routine work setting.

(Tr. 23.)  In making that determination, the ALJ conducted a credibility analysis.  (Tr. 23–32.)

The ALJ found partially credible the statements of Mr. Hochstetler concerning the intensity, persistence, and limiting effects of his symptoms.  (Tr. 25.)  She determined that the "alleged symptom severity and resulting functional limitation are not supported by the objective evidence to the degree alleged."  (Tr. 29.)  Additionally, the ALJ noted limited treatment in 2006 and 2007, followed by no treatment for any mental condition until December 2010.  (Tr. 29–30.)  The ALJ summarized, regarding Mr. Hochstetler's treatment with Dr. Moise, that he "does well when he takes his medication as prescribed."  (Tr. 30.)  She concluded:

> Significantly, despite the extensive longitudinal treatment history with Dr. Moise, as well as evaluations by other physicians, no physician made any clinical findings of functional limitation that would preclude the claimant from working in accordance with the assessed residual functional capacity.  Consequently, while the record demonstrates that [Mr. Hochstetler] has severe mental impairments, the [ALJ] finds that the resulting functional limitations are adequately accommodated by the assessed residual functional capacity.

(Tr. 30.)

The ALJ found the opinions of state agency medical consultants Dr. Brill and Dr. Hasanadka to be entitled to great weight because the ALJ determined that Mr. Hochstetler was able to perform "light" exertional levels with certain postural and environmental limitations.  (Tr. 30.)  The ALJ also afforded great weight to the opinions of State agency psychological consultants Dr. Hill and Dr. Unversaw because Mr. Hochstetler "retains the capacity to understand, remember, and carry-out simple tasks, along with social limitations largely consistent with the assessed residual functional capacity."  (Tr. 30.)  The ALJ also determined

that the opinion of Dr. Terpstra was entitled to great weight to the extent that it "can be considered an opinion that [Mr. Hochstetler's] alleged musculoskeletal impairments do not result in more than minimal limitation in [his] ability to perform basic work activities."  (Tr. 30–31.)

The ALJ found Dr. Coulter's findings that Mr. Hochstetler was limited to work consistent with "sedentary" exertional level to be inconsistent with the record as a whole and to be entitled to less weight.  (Tr. 31.)  Furthermore, the ALJ determined that Dr. Moise's opinion was entitled to little weight because her opinion is "contradicted by the majority of her own progress notes." (Tr. 31.)

At step four, the ALJ determined that Mr. Hochstetler was unable to perform his past work as either an inspector, packer, painter, forklift operator, feeder/off-bearer, dishwasher, or assembler, based on the VE's testimony and because the jobs exceeded the limitations set forth in the RFC.  (Tr. 32.)  At step five, the ALJ concluded that Mr. Hochstetler was not disabled because jobs existed in the national economy that Mr. Hochstetler could perform despite the limitations in the RFC.  (Tr. 33.)

**E.      Dr. William Terpstra**

One of the issues Mr. Hochstetler raises in this case is whether the ALJ erred in determining that the opinion of Dr. William Terpstra—one of the state consultative examiners—was entitled to great weight.  While not in the administrative record, the Court takes judicial notice of the following information regarding the current status of Dr. Terpstra's ability to practice medicine:

In March 2013, the Indiana Attorney General filed petitions with the Medical Licensing Board seeking to suspend temporarily Dr. Terpstra's license.  The state also sought to suspend the licenses of three other doctors at Wagoner Medical Center, where Dr. Terpstra practiced.

*State seeks license suspension for four Indiana doctors*, WTHR.com, Mar. 18, 2013,

http://www.wthr.com/story/21674050/state-seeks-license-suspension-for-four-indiana-doctors

(last visited Sept. 9, 2014, as were the others websites listed in this section). In April 2013, the

Drug Enforcement Administration and the Howard County Prosecutor's Office announced that

Dr. Terpstra had been charged with a total of twenty-four felony counts for various narcotics

distribution offenses. *Owner and Employees of Indiana Medical Center Charged with Multiple*

*Felony Counts*, Drug Enforcement Admin., April 19, 2013, http://www.justice.gov/dea/divisions/

chi/2013/chi041913.shtml. Also in April, Dr. Terpstra agreed not to practice medicine as a

condition of his bond in the criminal case; he separately agreed to have the Medical Licensing

Board declare his medical license inactive pending resolution of the matter. Scott Smith, *Former*

*Wagoner doctor Terpstra faces medical board*, Kokomo Tribune, April 25, 2014,

http://www.kokomotribune.com/news/local_news/article_eb5fa419-1533-55aa-b79e-

e4d2992a41f0.html.

These developments with Dr. Terpstra's license took place after the ALJ had rendered her

decision but before the Appeals Counsel denied Mr. Hochstetler's request for review.

### III. Standard of Review

This Court will affirm the Commissioner's findings of fact and denial of disability

benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th

Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v.*

*Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about

the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.* Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. Analysis

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). However, if a listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which is then used to determine whether the claimant can perform his past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Mr. Hochstetler challenges the ALJ's decision on several grounds, which the Court restates as three challenges. First, he argues that the Social Security Administration failed to follow its own regulations when the ALJ afforded substantial weight to the opinions of Dr. Terpstra. Second, he argues that the ALJ erred in not properly weighing the credibility of several other medical opinions, including that of his treating physician, Dr. Moise. Third, he argues that the ALJ erred in finding that Mr. Hochstetler did not meet Listing 12.03.

The Court begins with the second argument—regarding the weight given to medical opinions—and finds that the ALJ erred in failing to give good reasons when discounting the medical opinion of treating physician Dr. Moise. Because this error affected Mr. Hochstetler's RFC, the error requires remand for further consideration. In light of the remand, the Court will also briefly discuss other issues raised by Mr. Hochstetler, to guide the Commissioner's consideration on remand.

**A. The ALJ Improperly Evaluated the Opinions of Dr. Moise**

One aspect of the ALJ's decision that Mr. Hochstetler challenges is the weight given to the opinions of one of Mr. Hochstetler's treating physicians, Dr. Moise. Mr. Hochstetler argues that if the opinion were given its proper weight, then the ALJ would have either found that Mr. Hochstetler met a listing [DE 11 at 25] or that he otherwise met the standard for disability [*id.* at 23].

The opinion of a treating physician is generally afforded special deference in disability proceedings. The regulations governing social security proceedings instruct claimants to that effect:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R §§ 404.1527(c)(2), 416.927(c)(2).

Here, the ALJ found that a medical source statement completed by Dr. Moise and the opinions within it were entitled to little weight. (Tr. 22, 31). Ultimately, an ALJ's decision to give lesser weight to a treating physician's opinion is afforded great deference so long as the ALJ minimally articulates her reasons for doing so. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). The Seventh Circuit has deemed this very deferential standard to be "lax." *Id.*

Nevertheless, the ALJ "must offer 'good reasons' for discounting the opinion of a treating physician." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (citing *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) and *Campbell v Astrue*, 627 F.3d 299, 306 (7th Cir. 2010)). Examples that are not "good reasons" to discount the opinion of a treating physician include: misstating the record, *Scott*, 647 F.3d at 739 ("But the record *does* contain evidence that could be symptomatic of manic behavior" (emphasis in original)); reading inconsistency into a treating physician's assessment where there is no inconsistency, *id.* ("But the ALJ was too quick to read inconsistency into these statements"); and "selectively discuss[ing] portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability," *Campbell*, 627 F.3d at 306.

Here, the ALJ examined the medical source statement of Dr. Moise in two different contexts in her decision and each time determined that the opinions were entitled to "little weight." (Tr. 22, 31.) The ALJ articulated the following reasons for that analysis: (1) "Dr. Moises's opinion is not supported by the objective evidence, including Dr. Moise's own clinical findings" (Tr. 22); (2) "Dr. Moise's opinion is contradicted by the majority of her own progress notes" (Tr. 31); and (3) "the claimant testified that he has had no attendance issues at his current job" (*id.*). None of these reasons given by the ALJ are supported by the record. Additionally,

they appear to "cherry-pick" unfavorable evidence from the record, while ignoring evidence supporting Dr. Moise's opinions.

Starting with the clinical findings and progress notes of Dr. Moise, the ALJ notes that "just weeks before submitting this medical source statement, the claimant reported to Dr. Moise that his medication was working well and he was not experiencing any psychotic symptoms" and that "the claimant's mood had been stable and he was coping well with daily activities." (Tr. 22.) The ALJ also states "Dr. Moise typically found the claimant had a euthymic mood and was doing well when he was compliant with his medication." (Tr. 31.)

This analysis appears to equate Mr. Hochstetler sometimes not being affected by auditory hallucinations with an ability to sustain steady full-time employment. But making such an equation is a fallacy. As the Seventh Circuit has noted, a "person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition." *Punzia v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *see also Scott*, 647 F.3d at 740 ("people with [mental] disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated.").

Moreover, the ALJ ignores evidence that Mr. Hochstetler did not always respond well on medication. For example, in August 2012 Mr. Hochstetler was "taking his medication as prescribed," but still suffered substantial mental impairments. (Tr. 691.) Dr. Moise noted that Mr. Hochstetler "has been experiencing auditory hallucinations ('the voices talk to me all the time now'), persecutory delusions (he feels that people are 'after' him), which have worsened over the past few weeks." (*Id.*) Particularly relevant here, the "symptoms started after he went

to work." (*Id.*)  Despite these medical records, the ALJ's credibility analysis fails to account for the fact that, at times, Mr. Hochstetler's conditions is not well controlled by medication.

Similarly, the ALJ's focus on Mr. Hochstetler's often "euthymic" mood[7] is cherry picking and misses the point.  It is true that, on many occasions, Dr. Moise's notes describe Mr. Hochstetler's mood as "euthymic."  However, during some of those same visits, Mr. Hochstetler is experiencing auditory hallucinations, appears disheveled, has a restricted affect, and is having a hard time leaving his home due to anxiety.  (Tr. 691, 734, 744, 754, 766.)  Moreover, the ALJ does not draw any logical bridge between a euthymic mood and the opinions expressed by Dr. Moise or how a euthymic mood can sustain full-time employment in light Mr. Hochstetler's other mental impairments.

Finally, the ALJ either misstates or overlooks relevant portions of the record in discounting Dr. Moise's opinion that Mr. Hochstetler is likely to miss more than three days of work per month due to his mental impairments.[8]  Here, the ALJ states: "the claimant testified that he has had no attendance issues at his current job.  While the . . . claimant currently is working part-time, as noted above, this appears to be due to the lack of available hours, not due to the claimant's inability to work more hours."  (Tr. 31.)

In reaching this conclusion, the ALJ makes at least two errors.  First, the lack of attendance issues during part-time employment cannot, by itself, diminish the opinion of a treating physician that attendance issues are likely to arise if the claimant attempts full-time employment, since full-time employment is likely to impact the claimant's limitations in a way that part-time employment does not.  Second, the ALJ appears to conclude that Mr. Hochstetler's

---

[7] Euthymia is defined as either "joyfulness; mental peace and tranquility" or "moderation of mood, not manic or depressed."  Stedman's Medical Dictionary (27th ed. 2000).

[8] As confirmed by the VE at the December 2012 hearing, missing that much work would preclude full-time employment.

mental impairments have no relationship to any potential hours limitation in his part-time employment, stating that the department in which he works cannot provide him more hours. But the ALJ ignores that the reason Mr. Hochstetler works in that department is at least partially related to his mental condition. (Tr. 691 (discussing how symptoms were exacerbated by work and Mr. Hochstetler sought a transfer to minimize his symptoms).) When viewed as a whole, the record (including Dr. Moise's progress notes) appears to be consistent with Dr. Moise's opinion regarding Mr. Hochstetler's likely absences from full-time employment.

Based on the discussion above, each of the reasons given by the ALJ to diminish the weight given to the opinion of Dr. Moise was not a "good reason." Accordingly, the ALJ erred in affording little weight to the opinion of Dr. Moise. Because this credibility determination affected Mr. Hochstetler's RFC determination, and thus the analysis at steps four and five, the Court will remand to the Commissioner for further proceedings consistent with this opinion.

**B.      Other Issues that may be Considered on Remand**

The issues identified above are sufficient to dictate a remand for further proceedings before the Commissioner. However, for the sake of completeness and to help ensure that the Commissioner's decision on remand is free from unnecessary errors, the Court briefly addresses the other issues raised by Mr. Hochstetler in this Court.

**1.      Whether Mr. Hochstetler's Condition Meets or Equals Listing 12.03**

Mr. Hochstetler argues that the opinion of Dr. Moise, discussed above, is sufficient to demonstrate that Mr. Hochstetler's condition meets Listing 12.03, and therefore he should be granted benefits. The Commissioner responds that the form of the Mental Impairment Questionnaire completed by Dr. Moise—which appears to be the only evidence on which Mr. Hochstetler relies—was an obsolete version of the form, and therefore did not ask the doctor to

opine on questions relevant to the determination of whether Mr. Hochstetler's condition met the listing.

The Commissioner is correct that the form completed by Dr. Moise does not parallel the current language of the Listing 12.03 criteria. For example, while the current listing looks to number of "episodes of decompensation, each of extended duration," *see* footnote 5 above, the form completed by Dr. Moise asked about "[e]pisodes of deterioration or decompensation in work or work-like settings." (Tr. 607.) Additionally, while the current listing examines deficiencies of concentration, persistence, and pace on a normative level (requiring "marked" deficiencies to satisfy the paragraph B criteria), the form completed by Dr. Moise addressed only the frequency of such deficiencies. (*Id.*) The burden at step two is on the claimant, *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999), and absent any authority or additional evidence, the Court cannot determine on the current record that Mr. Hochstetler's condition meets or equals Listing 12.03.

On remand, however, the Commissioner may wish to obtain from Dr. Moise a completed questionnaire that uses the current language of the listings in order to assess whether Mr. Hochstetler's condition meets or equals a listed impairment.

**2.      Whether the ALJ Erred in Relying on Dr. Terpstra**

Mr. Hochstetler challenges the opinions of Dr. Terpstra and the weight afforded them by the ALJ. To the extent that Mr. Hochstetler challenges the Commissioner's decision to refer Mr. Hochstetler to Dr. Terpstra[9]—because Dr. Terpstra was not a "highly qualified physician" as defined by the Social Security regulations—that claim is not properly before this Court. This argument is somewhat similar to one raised in *Miller v. Jeffers*, where the claimant challenged

---

[9] In his reply brief, Mr. Hochstetler argues that "the Administration would have known [about the true qualification of Dr. Terpstra] if they were not completely indifferent about the true qualifications of the 'medical experts' they send the disabled to see." [DE 21 at 2.]

the Commissioner's monitoring of the consultative examination program.  142 F. Supp. 2d 761, 763–64 (S.D. W. Va. 2001), *aff'd*, 40 F. App'x 765 (4th Cir. 2002).  In that case, the district court determined that the Administrative Procedure Act barred judicial review of the agency action, since monitoring the consultative examination program is an action "committed to agency discretion by law."  *Id.* at 764.  Additionally, whether or not Mr. Hochstetler should have ever been referred to Dr. Terpstra in the first place misses the point.  Mr. Hochstetler was not denied benefits because he was referred to Dr. Terpstra; it was the weight afforded to Dr. Terpstra's opinion by the ALJ that affected Mr. Hochstetler's disability determination.

With respect to the weight that should have been afforded to Dr. Terpstra's opinion, new and at least potentially material evidence has come to light regarding Dr. Terpstra's fitness to practice medicine.  This evidence could bear on the credibility of Dr. Terpstra's opinions; as Mr. Hochstetler puts it in his reply brief, "[i]f the ALJ had known that Dr. Terpstra was an alleged drug dealer and that his medical license was suspended, is it likely the ALJ would have still found the opinion of Dr. Terpstra was 'entitled to great weight' anyway?"  [DE 21 at 2.]  The Commissioner's only response to this new information regarding Dr. Terpstra's credibility is that it is not in the administrative record.

A procedure does exist by which the Court can order the Commissioner to consider new and material evidence.  42 U.S.C. § 405(g) (sentence six); s*ee also Gross v. Astrue*, No. 08 CV 578(NG), 2010 WL 301945, at *3 (E.D.N.Y. Jan. 15, 2010) (remanding for consideration of weight to give opinion of doctor who had entered into consent decree to limit medical practice).  However, Mr. Hochstetler has not specifically asked for a sentence six remand in this case.  In any event, because the Court is already remanding on another ground, the Commissioner will have an opportunity on remand to consider whether Mr. Hochstetler should be evaluated by a

new consultative examiner who is not saddled with the same credibility issues as Dr. Terpstra and what weight, if any, to afford the opinions of Dr. Terpstra in light of the newly discovered evidence.

### 3. Whether the ALJ Properly Accounted for Mr. Hochstetler's COPD

With respect to Mr. Hochstetler's COPD, Mr. Hochstetler takes issue with the ALJ's statement that there was insufficient objective evidence to find that the claimant's respiratory condition causes more than minimal limitation in his ability to perform basic work activities. Mr. Hochstetler argues that "[w]hat the <u>objective evidence</u> shows is that Mr. Hochstetler has 'advanced COPD' and there is no objective evidence to the contrary." [DE 11 at 26 (emphasis in original).] However, Mr. Hochstetler makes no attempt to show what affect the COPD would have on his residual functional capacity, so the Court finds no error.

### 4. Whether the ALJ Properly Accounted for Mr. Hochstetler's Musculoskeletal Issues

Finally, Mr. Hochstetler appears to argue that the ALJ should have found that his back disorder and knee disorder were severe impairments. He argues that an earlier decision by the same ALJ did find those conditions to be severe, but after remand (and consideration of the opinion of Dr. Terpstra), the ALJ did not find them to be severe impairments in her 2012 decision. However, the Commissioner correctly notes that once an ALJ has found one severe impairment, the ALJ must consider all impairments—whether or not they are severe—in assessing the claimant's RFC. [DE 17 at 15–16 (citing *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010)).] Mr. Hochstetler does not indicate how the residual functional capacity fails to account for any musculoskeletal issues, so the Court does not find this an independent reason to remand. As noted earlier, the remand will provide the Commissioner an opportunity to re-assess

the credibility of Dr. Terpstra's findings and their impact on Mr. Hochstetler's RFC and claims of disability.

## V.  Conclusion

For the reasons stated above, Mr. Hochstetler's request to remand is **GRANTED**.  The Court **REMANDS** this case for further consideration by the Commissioner, consistent with this opinion.

SO ORDERED.

ENTERED:  September 9, 2014

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court
